UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA                :
                                        :
                                        :    09 CR 555 (HB)
            - against -                 :
                                        :    OPINION &
                                        :    ORDER
WILKIN AQUINO, ET AL.                   :
                                        :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Defendant Wilkin Aquino ("Aquino" or "Defendant"), along with two co-defendants, is charged in a one-count indictment with conspiring to distribute and possess with the intent to distribute cocaine and cocaine base (commonly known as "crack") in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.  Aquino moves to suppress evidence obtained as a result of his arrest following a high speed chase and a subsequent search of his residence.  Specifically, Aquino alleges that (1) he was illegally stopped and arrested (2) subsequent to his arrest, a bag found to contain kilogram packages of cocaine was illegally searched, and (3) his home was illegally searched without a warrant or warrant-less exception, both in violation of the Fourth Amendment.  I heard argument and held an evidentiary hearing on September 23, 2009.  For the reasons that follow, Aquino's motion is DENIED in full.

## FACTUAL BACKGROUND

      Wilkin Aquino was arrested on May 2, 2009 as a result of an approximately two-week long Drug Enforcement Agency ("DEA") Narcotics Task Force surveillance operation.  Tr. of September 23, 2009 Hr'g. ("Tr."), 28.  In time, the drug trafficking investigation came to focus on Aquino and two associates. Tr. at 5, 67, 105.  The surveillance team included Officers Anthony Fasolas, Jose Garcia, and Jeff Van Peenan, (the "DEA Officers") all of whom had many years of law enforcement experience as both New Jersey police officers and federal Task Force Officers.[1]  Tr. at 4, 66-67, 98-99.

---

[1] All three officers are members of various New Jersey police departments, but have been placed "on loan" to the DEA and have worked as members of the Task Force for a number of years.

1

Officer Van Peenan began the surveillance of the Defendant at around 7 P.M. on May 2. He witnessed Aquino exit 17 Martin Street in Paterson, New Jersey and drive off in a black Honda. Tr. at 100, 107. Van Peenan then followed Aquino to 941 28th Street in Paterson, where he saw Aquino exit the vehicle with a bag that appeared to be empty, enter the 28th Street residence, and exit again with the bag now looking "heavy." Tr. at 100-01, 107. Officers Garcia and Fasolas, both in plain clothes and unmarked vehicles, took over mobile surveillance at this point and followed the Defendant as he drove through Paterson. Tr. at 5-6, 34, 69, 81.

Officer Fasolas drove behind Aquino and was followed by Garcia as they approached a red light at the intersection of 20th Avenue and Madison Avenue. Tr. at 7, 51, 82. According to Garcia and Fasolas, the Defendant approached the intersection on 20th Avenue, pulled to the right of the vehicles waiting at the red light, and made a right turn onto Madison Avenue without coming to a complete stop – a violation of New Jersey traffic law. Tr. at 8-11, 69-70; N.J.S. § 39:4-115 (right turn on a red light shall be made only "after coming to a full stop"). Aquino testified to the contrary at the evidentiary hearing, stating that he waited in the line of cars for a green light before turning, and that he could not have turned right on red due to parked cars in the right-most lane.[2] Tr. at 117-19. After witnessing the turn, Officer Fasolas turned on his lights and siren, and pulled over the Defendant. Tr. at 11-12, 50. As Fasolas began to approach Aquino's vehicle, Aquino drove off and thus began a high-speed chase. Tr. at 12, 71. Both Garcia and Fasolas saw the Defendant commit numerous traffic violations as they pursued him: speeding in a residential area, driving against traffic, and running stop signs. Tr. at 13-14, 72. Aquino testified on his own behalf that the officers never used lights and sirens nor showed any identification, and that he drove off because he believed he was about to be robbed and was frightened. As a result of these beliefs, he admits that he was speeding and ran stop signs during the pursuit. Tr. at 119, 126, 129.

At some point in the pursuit, Aquino ended up facing Officer Fasolas' car head-on, exited his vehicle, and continued to flee on foot. Tr. at 15. According to Fasolas and Garcia, Aquino took a bag out of the vehicle with him but immediately dropped it as he fled; Aquino claims that he never took a bag out of the car. Tr. at 15, 57, 73-74, 123. Aquino was chased by all three

---

[2] At the hearing, counsel for defendant highlighted the fact that Officer Garcia made inconsistent prior statements at the Grand Jury Hearing. Specifically, Officer Garcia testified that he saw Aquino initially run a stop sign, and that he was pulled over by a Paterson patrol car. Tr. at 82-87. Despite the inconsistency, I find Officer Garcia's testimony credible. He admitted he was mistaken and explained that he had not reviewed any case materials in preparation for the Grand Jury testimony. Tr. at 83-84, 90, 95. In any event, for the reasons described *infra*, this disputed issue has no bearing on my decision.

2

officers, eventually apprehended, and placed under arrest. Tr. at 16, 101. Officer Fasolas returned to Aquino's vehicle after the arrest and saw the bag that Aquino dropped laying on the ground. Tr. at 17. He testified that the bag had a zipper but was left unzipped, and that he could see two to three partially exposed "plastic wrapped items" protruding from the bag. Tr. at 17, 54-57. The bag was later shown to contain eight one-kilogram plastic-wrapped packages. Tr. at 20-21; Gov't Ex. 3. Tests indicated that the items in the bag contained cocaine. Tr. at 22. Aquino was placed in a patrol car and taken to the Paterson Police Department. Tr. at 23-24, 103.

Following this arrest, the DEA Officers went back to 17 Martin Street, where they arrested Aquino's co-defendants as they exited the residence. The officers then had Aquino brought to the Martin Street location. Tr. at 24. Officer Garcia testified that he read Aquino his *Miranda* rights in Spanish, and that Aquino indicated he understood his rights. Tr. at 74-75, 103. Garcia further noted that Aquino refused to sign a waiver of his rights, but still spoke to the officers; the Defendant claims he was never informed of his rights and that he said nothing other than he wasn't speaking without his lawyer. Tr. at 74-75, 103, 124-25. At some point, in Spanish and English, Officer Garcia asked the defendant if they could search his residence. According to Garcia, Aquino responded in "street lingo" that "you can check my house, I don't care…I don't have nothing to hide." Tr. at 75. Officer Van Peenan stated that he likewise asked the defendant if he could search his residence in Garfield, New Jersey, and that despite a "bad attitude" and his statement that he "didn't want to cooperate," he said "do whatever you want, nothing is there." Tr. at 103, 114. Garcia and Van Peenan stated that there was no difficulty communicating with the Defendant, that they questioned him for only a few minutes, never raised their voices or heard others do so, and never displayed their weapons. Tr. at 76-77, 104. During the questioning, Aquino was handcuffed and seated in the back of a patrol car. Tr. at 75-76. Aquino did not sign any written consent form. Tr. at 93.

The officers next went to Aquino's residence on Chestnut Street in Garfield, New Jersey. Tr. at 28-29. They knocked on the door of the residence and announced their presence, but received no response. Tr. at 31. One of the officers put his ear to the door and heard noises inside. Tr. at 31-32. The DEA Officers then made a forcible entry into the residence. Tr. at 31, 78. Upon entry, they discovered that no one was home and the noise came from a television that was left on. Tr. at 79. A search of the residence uncovered a large amount of U.S. currency. Tr. at 79-80.

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures, shall not be violated …" U.S. CONST. AM. IV.  In this case, the Defendant challenges as unreasonable his initial seizure, the search and confiscation of the bag and the narcotics found after his arrest, and the entry and search of his home.  He seeks to suppress all evidence found as a result of these actions.

### A.     The Arrest of Aquino

Aquino argues that the initial stop made by the DEA Officers on Madison Avenue was an illegal seizure, and therefore the evidence uncovered as a result should be suppressed. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  The stop, to pass muster, "must be justified by probable cause or reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d 777, 781 (2d. Cir. 1994) (internal quotation and citation omitted).  Evidence seized as a result of an illegal stop may be suppressed as "fruit of the poisonous tree." *Id.*; *Won Sun v. United States*, 371 U.S. 471 (1963). Defendant appears to make two distinct claims related to his traffic stop and subsequent arrest: (1) that he did not commit a traffic violation initially, and was illegally seized when first pulled over by Officer Fasolas, and (2) that the stop was a mere pretext for the DEA's actual goal of discovering drug-related evidence.  Both arguments fail for the reasons that follow.

In a traffic stop setting, pulling over briefly and then driving away in defiance of a police order does not constitute a seizure.  *United States v. Baldwin*, 496 F.3d 215, 218 (2d. Cir. 2007). An analysis of whether a stop constitutes a seizure is based not on its length, but on the nature of the interaction. *Id.* at 219.  The facts in this case are materially similar to those in *Baldwin*, and demonstrate that no seizure occurred following the initial stop of the Defendant.  In *Baldwin*, the defendant was pulled over by police because he matched a description of an individual carrying a firearm, stopped for a brief moment while the police began to approach his vehicle, and then "sped off." *Baldwin*, 496 F.3d at 217.  As a result, the defendant was not seized until after the car chase, when he was finally arrested. *See, id.* at 220.  Since the defendant was not seized at the initial stop, all of the "untold number of traffic laws" broken by the defendant during the car chase constituted "pre-seizure" behavior that supported probable cause for his arrest. *Id.*  Here, Aquino likewise stopped momentarily, waited while Officer Fasolas exited his vehicle, and then

4

drove off. His conduct "amounted to evasion of police authority, not submission." *Id.* at 219. Indeed, Aquino himself claims that he did not even know Fasolas and Garcia were officers when they initially tried to stop him. He was not ultimately seized until he was physically restrained and arrested after the car chase ended. Aquino admits that during the chase he ran stop signs and drove at an excessive speed, and the officers likewise testified that they witnessed these traffic violations. As a result, the DEA Officers had sufficient factual support for probable cause to arrest the Defendant once the high-speed pursuit ended.[3]

Aquino also argues that the traffic stop was a pretext for the DEA Officers' actual purpose of uncovering narcotics-related criminal activity, and that "the Fourth Amendment…prohibits officers from using pretextual reasons to make a stop, conduct a search, or effect a seizure." Def. Post-Hr'g Br. at 5. The law on this point is clear: so long as police officers act within their authority to stop and arrest a suspect, any pretextual reasons the officers may have is not relevant. In *United States v. Scopo*, a mob task force of the police department was tasked with confiscating as many guns as legally possible in order to reduce the possibility of violence related to an internal Colombo Family "shooting war." 19 F.3d at 779-80. Members of the task force stopped the defendant after they witnessed him commit a number of traffic violations, and, as a result, confiscated a loaded .38 caliber pistol. *Id.* The Second Circuit found that the officers stopped the defendant based on "specific and articulable facts," the observation of the traffic violations, and that although they were minor offenses, "the officers acted within their authority in stopping Scopo for violation of the state law." *Id.* at 781. "[T]he fact that an officer may be engaged in an arrest which would not usually be effected in the course of the officer's normal duties does not negate the validity of the arrest." *Id.* at 783. These points apply with equal force in this case: the DEA Officers observed Aquino commit numerous traffic violations during the high-speed pursuit. Whether or not they hoped to find something drug-related is of no moment, because they had sufficient factual support for the stop and to arrest the Defendant. *See, id.* ("that they 'hoped' to discover firearms in Scopo's car, should not be the determinative factor[]").

---

[3] Since Aquino was not seized after the initial stop by Officer Fasolas, the factual dispute as to whether the Defendant actually turned right on red without stopping need not be resolved. Even if the officer's initial order to stop was unlawful because no traffic violation was committed, the Supreme Court "has implicitly authorized a defendant's seizure based on events occurring after issuance of an unreasonable order to stop." *Baldwin*, 496 F.3d at 220 (quoting *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005)).

As a result, I find that the Defendant was lawfully seized following the car chase with Officers Fasolas and Garcia.

### B. Search of Bag and Contents

Aquino also challenges the search of the bag which resulted in the discovery of eight kilograms of cocaine. He disputes that the he dropped the bag when he fled on foot, testifying at the hearing that he left the bag in the vehicle. By contrast, both Officers Fasolas and Garcia state they observed Aquino exit the vehicle with the bag and then drop it after he tripped on his flip-flops while running away. On balance, I find the DEA Officers' testimony more credible than that of the Defendant, and agree that the bag was discovered outside of the vehicle subsequent to the arrest. As a result, I find that the bag was lawfully searched and seized as it was abandoned by the defendant.

Although the Fourth Amendment guarantees an expectation of privacy against unreasonable search "in their persons, houses, papers, and effects," an individual loses this expectation when they abandon that property. *See Abel v. United States*, 362 U.S. 217, 241 (1960) ("[P]etitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property."); *United States v. Welbeck*, 145 F.3d 493, 498 (2d Cir.1998) ("A warrantless seizure of abandoned property does not offend the Fourth Amendment."); *United States v. Lee*, 916 F.2d 814, 818 (2d. Cir. 1990) ("When a person voluntarily abandons property, however, he forfeits any reasonable expectation of privacy that he might have had in the property."). Abandonment is a factual determination that turns on the intent of the defendant, based upon all the relevant circumstances relevant to the seized property. *Lee*, 916 F.2d at 818. When a defendant flees from the police and drops an item in the course of his pursuit by the police, it is typically deemed abandoned. *See, Hodari D.*, 499 U.S. 621, 629 (1991) (cocaine dropped during foot pursuit deemed abandoned); *United States v. Belk*, 174 F. Supp. 2d 138, 143 (S.D.N.Y. 2001) (collecting cases in determining that defendant abandoned weapon dropped during pursuit).

Here, after Aquino tried to evade the DEA Officers in his vehicle, he left his car and tried to outrun them on foot. He exited the vehicle with his bag, but almost immediately dropped it and continued to run away. The Defendant gave up on his bag, likely realizing that his efforts to flee would be rendered easier if he were not carrying a bulky item. *See, Lee*, 916 F.2d at 818 (intent may be inferred by "acts done"). Aquino's act of abandonment eliminated any

6

expectation of privacy he had in the bag, and left the officers free to search the bag and seize its contents without running afoul of the Fourth Amendment.[4]

### C.    Search of Aquino's Residence

Lastly, the Defendant challenges the search of his residence without a warrant or a warrant-less exception.  The government responds that the search was valid based on the fact that they received consent to search from Aquino, and because they believed exigent circumstances necessitated the immediate entry and search.  To be reasonable under the Fourth Amendment, a search of a home must be conducted pursuant to a warrant or meet an exception to the warrant requirement.  *See Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003).  A warrantless search is *per se* unreasonable unless one of a "few specifically established and well-delineated exceptions" applies.  *Moore v. Adreno*, 505 F.3d 203, 208 (2d Cir. 2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  The Supreme Court has held that warrantless searches and seizures inside a home are presumptively unreasonable, and therefore the Government bears the burden of proving that the entry was justified.  *See Payton v. New York*, 445 U.S. 573, 585-86 (1980) (internal quotations omitted); *United States v. Cabare*, 871 F.2d 282, 289 (2d. Cir. 1989) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971)).

One valid exception to the warrant requirement is when law enforcement receives consent to search the item of place in question.  *See Schneckloth*, 412 U.S. at 219 ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent"); *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d. Cir. 2002).  Consent is a question of fact to be determined from all of the surrounding circumstances. *See Schneckloth*, 412 U.S. at 248-49; *Pelligrino*, 303 F.3d at 124 ("courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority") (internal quotations and citations omitted).  It is an objective test, where the court must analyze "whether the agents had a reasonable basis for believing that there was a valid consent to the search."  *U.S. v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (citing *Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)).  Relevant factors include whether the person is in custody and handcuffed, whether there is a show of force, whether the agents told the defendant that a search warrant would be

---

[4] The government also argues that the search of the bag was valid based on the "plain view" doctrine, since Officer Fasolas testified that he could see the packages sticking out of the bag and recognized them to likely be kilograms of cocaine.  Although I find this argument persuasive, I need not rule on this issue since I have determined that the Defendant abandoned the bag.

obtained, whether defendant had knowledge of his right to refuse, and whether defendant previously refused to consent. *Id.* (collecting cases).

The facts in this case present a close call, but I ultimately find that the Defendant provided consent to search his home. Clearly, a number of facts cut against the government's assertion that they received consent to search. Aquino did not sign a waiver of rights or consent to search form. He told the officers that he chose not to cooperate. He testified that he asked for a lawyer and said he would not talk without one. He was not told that he had a right to refuse to consent.[5] The officers thought that he had a "bad attitude" and that he was uncooperative and he stated "do whatever you want," suggesting that his responses were more a matter of petulance in the face of the officers' questions rather than a thought-through decision to allow the search of his residence. However, the balance of facts suggest that Aquino's consent was not a result of "acquiescence to a show of authority," but rather given by his own free choice. Aquino was in custody for only a short period of time when he spoke to Officer Garcia. He was read his *Miranda* rights and indicated he understood them. He was not questioned extensively prior to the request for consent. *See United States v. Arrango-Correa* 851 F.2d 54, 57 (2d. Cir. 1988) (collecting cases where individuals in custody for many hours still provided valid consent). He was not told that a search warrant would be obtained regardless of his response. The officers spoke in normal tones of voice, did not draw or display their weapons, and did not threaten or suggest that consent was the only way for the Defendant to escape punishment. *See Arrango-Correa*, 851 F.2d at 56 (defendant who agreed to answer questions, was not handcuffed, where no weapons were drawn and agents spoke in normal tones provided valid consent to search apartment).

That Aquino claims he did not consent nor speak to the officers except to assert his right to counsel gives me some initial pause, but I ultimately do not find his testimony credible. The majority of Aquino's testimony consisted of brief "yes" or "no" responses to his counsel's highly

---

[5] The Defendant argues in his brief that police officers are required to notify individuals of their right to refuse to consent pursuant to New Jersey state law, and that therefore the evidence should be suppressed as a violation of the Fourth Amendment. While perhaps significant to a challenge of a state prosecution, a violation of state law does not affect a suppression analysis in a federal prosecution governed by federal law. *See United States v. Pforzheimer*, 826 F.2d 200, 203 (2d Cir. 1987) ("in the determination of whether there has been an unreasonable search or seizure, the test is one of *federal* law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.") (internal citations and quotations omitted); *United States v. Workman*, 80 F.3d 688, 694 (2d. Cir. 1996) ("where evidence seized by state officers is subsequently offered in a federal criminal proceeding, the seizure need not satisfy state law requirements.") (internal citation omitted). The fact that the officers failed to notify Aquino of his right to refuse is but one factor among many in the consent analysis. *Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").

leading questions. *See, e.g.,* Tr. at 123 ( "Q. When you got out of the car after being stopped, did you bring anything with you?  A.  No."); Tr. at 125 ("Q.  Were you ever asked permission to search the Garfield address?  A. No, I didn't.").  Although he did elaborate at some points, including as to the claim that he did not consent, Tr. at 124, the testimony is sparse and seems almost entirely self-serving.  By contrast, Garcia and Van Peenan's testimony regarding the issue of consent corroborate each other.  Further, it was not entirely self-serving as they, as well as Fasolas, concede that Aquino was somewhat hostile to their inquiries and even conceded that he "didn't want to cooperate." Tr. at 103, 114.  The testimony is a mixed bag for the government, but also suggests truthfulness on the part of the officers.   As such, I find the DEA Officer's testimony credible that  Aquino told them "you can check my house, I don't care," a nearly unambiguous statement of consent that the officers could have taken at face value, even if he had a disagreeable demeanor.  There is little to suggest a "possibly vulnerable subjective state" in the Defendant; indeed his statements suggest that he was confident that the police would find nothing of interest and that he was not particularly concerned about the search. *See, Schneckloth*, 412 U.S. at 229.  In sum, although Aquino appeared to be somewhat hostile during questioning, his response that "you can check my house," coupled with the fact that there was little indication that any officer tried overcome his will or force him to consent indicates that valid consent to search the home was granted to the DEA Officers.[6]  As a result, the physical evidence obtained from the search of Aquino's home will not be suppressed.

---

[6] Since I have determined that consent was properly given, I decline to analyze whether there was sufficient "exigent circumstances" to enter the home without a warrant.  I will note, however, that the evidence presented was not particularly persuasive.  The government's argument rested almost entirely on the DEA officer's experience that in narcotics investigations, suspects may try to destroy evidence when they believe police may enter the building, and that they heard noises inside the residence when they arrived.  This alone does not seem sufficient to warrant the exigent circumstances exception for the destruction of evidence, particularly since the Defendant was arrested far away from his residence and there was no indication that anyone knew of his arrest other than the other arrested suspects.

## CONCLUSION

For the foregoing reasons, Aquino's motion to suppress on Fourth Amendment grounds the physical evidence seized subsequent to his arrest and following a search of his home on May 2, 2009 is DENIED.

SO ORDERED
October 7, 2009
New York, New York

_____
U.S.D.J.

10